941 F.2d 622
 131 P.U.R.4th 132
 CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
and
Illinois Cities, Intervening-Respondent.
ILLINOIS CITIES, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
and
Central Illinois Public Service Company, Intervening-Respondent.
 Nos. 89-1810, 89-2037.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 3, 1990.
Decided Aug. 28, 1991.
Rehearing Denied Oct. 10, 1991.
 
 Charles F. Wheatley, Jr., Peter A. Goldsmith, Timothy P. Ingram, Wheatley & Ranquist, Annapolis, Md., for petitioner in No. 89-2037.
 David J. Rosso, Jeffrey A. Cahn, Jones, Day, Reavis & Pogue, Chicago, Ill., Jerome M. Feit, Joanne Leveque, F.E.R.C., Washington, D.C., Lawrence F. Coffill, Chicago, Ill., for respondent and intervening-respondent in No. 89-2037.
 David J. Rosso, Jeffrey A. Cahn, Jeffrey J. Baker, Jones, Day, Reavis & Pogue, Chicago, Ill., for petitioner in No. 89-1810.
 Jerome M. Feit, Louis D. Cashell, Thomas L. Blackburn, C. Stephen Angle, George P. Lewnes, Joanne Leveque, Samuel Soopper, Joseph S. Davies, F.E.R.C., Washington, D.C., Lawrence F. Coffill, Chicago, Ill., Charles F. Wheatley, Jr., Wheatley & Ranquist, Annapolis, Md., Bruce F. Barnes, Barnes, Henry, Meisenheimer & Gende, St. Louis, Mo., for respondent in No. 89-1810.
 Charles F. Wheatley, Jr., Peter A. Goldsmith, Timothy P. Ingram, Wheatley & Ranquist, Annapolis, Md., for intervening-respondent in No. 89-1810.
 Before BAUER, Chief Judge, MANION, Circuit Judge, and WILL, Senior District Judge.[1]
 BAUER, Chief Judge.
 
 
 1
 This appeal involves the proper distribution of settlement proceeds received by a utility, the Central Illinois Public Service Company ("CIPS"). Respondent Federal Energy Regulatory Commission ("FERC" or the "Commission") found CIPS' distribution plan unreasonable and ordered an alternate disposition of the proceeds. Petitioners Illinois Cities ("Cities"),[2] wholesale customers of CIPS, intervened in the subsequent litigation. We hold that CIPS' distribution was indeed reasonable, and therefore, we reverse the Commission's orders.
 
 I.
 
 2
 CIPS is an electric utility that supplies electricity to approximately 307,000 customers in central and southern Illinois. CIPS supplies electricity to two categories of customers: retail and wholesale. The retail customers--households, factories, and other businesses--purchase power for their own use. About 80% of CIPS' sales are to retail customers. The Illinois Commerce Commission ("ICC") has jurisdiction over the rates at which CIPS distributes electricity to its retail customers. The remaining 20% of CIPS' sales are to wholesale customers, who purchase electrical power from CIPS and then resell it to the ultimate consumers. Certain municipalities and rural electric cooperatives are CIPS' wholesale customers. FERC has jurisdiction over the rates for sales to wholesale customers.
 
 
 3
 This case arose as a result of litigation between CIPS and Consolidated Coal Company ("Consol") over a long-term coal supply agreement between the parties. The crux of that case was the quality of the coal being supplied by Consol and in particular, its BTU content.[3] The case went to jury trial in March 1983. At trial, CIPS sought to recover $90.4 million in damages from Consol. The damages consisted of several different elements and were grounded in different legal theories. CIPS alleged damages in the following categories:
 
 
 4
 (1) Fraud Damages: CIPS alleged that Consol had tampered with coal samples to cause them to show a higher BTU content than that of the coal actually delivered, resulting in CIPS overpaying for coal;
 
 
 5
 (2) Increased Maintenance Costs: CIPS alleged that the poor quality (low BTU value) of the coal supplied by Consol resulted in poor burning characteristics, thus increasing maintenance expenses for boilers and related equipment;
 
 
 6
 (3) Supplemental Coal Purchase Costs: CIPS alleged that it had to purchase coal on the market at prices above the contract price with Consol, both because Consol failed to deliver all coal required by the contract and to augment the quality of the coal that was supplied;
 
 
 7
 (4) Lost Generation Expenses: CIPS alleged that Consol's fraud and contract breaches caused decreased electrical production from the Coffeen station. CIPS had to replace the lost output by using higher cost electrical generating units or purchased power; and
 
 
 8
 (5) Increased Financing Charges: CIPS alleged that, because of the other damages incurred, CIPS generated less money internally than it otherwise would have, resulting in the need to raise more funds externally and the consequent costs of raising that capital.
 
 
 9
 Additionally, CIPS sought a declaration that it was entitled to terminate the coal supply agreement.
 
 
 10
 Of the five types of damages alleged by CIPS, only three (fraud damages, supplemental coal purchase costs, and the lost generation expenses) could have resulted in increased fuel costs for CIPS. The utility passed to its ratepayers much of this alleged increase in costs through the "Fuel Adjustment Clause" ("FAC").[4] The other two damage claims (increased maintenance costs and increased financing charges) are not related to costs that could have been recovered through the FAC; any of these damages actually incurred were borne by CIPS' shareholders.
 
 
 11
 After four weeks of trial, the parties settled. The settlement agreement dictated that Consol would pay CIPS $25 million. Five million dollars was to be paid immediately, and the remaining $20 million plus interest was to be paid in roughly equal installments over the next three years. Consol reserved the right to prepay all or a part of the unpaid balance. Moreover, Consol also agreed to immediate termination of the coal supply agreement, thus allowing CIPS to replace the Consol coal with a reasonably priced, better quality fuel. On June 10, 1983, less than three months after the settled agreement was reached, Consol prepaid the remaining $20 million, plus $444,722 in interest.
 
 
 12
 After settling the case, CIPS had to decide what to do with the settlement proceeds. CIPS decided that $18 million of the $25 million should be distributed to CIPS' customers; the remaining $7 million and any interest paid by Consol should be kept for the shareholders. The customers (or ratepayers) received their $18 million share of the proceeds, without interest, through a series of credits to the monthly FAC over a four year period from 1984 to 1987.
 
 
 13
 CIPS decided to use the FAC as a distribution mechanism for two reasons. First, because Consol was to pay the $25 million in installments, CIPS needed a mechanism that would let it equitably distribute the ratepayers' portion of those installment payments over a period of time comparable to the period covered by the installments. The FAC provided such a mechanism. Thus, the $18 million would be distributed to the ratepayers by treating the ratepayers' portion of each installment paid by Consol as a credit to the cost of fuel during the twelve-month period following receipt of the installment payment. Second, CIPS needed a method for allocating the ratepayers' portion of the settlement among them on a fair and equitable basis. CIPS decided that, under the circumstances, current energy consumption, as reflected in the FAC, provided an appropriate method because the claimed damages were incurred over a long period of time and it was virtually impossible to determine how specific customers might have been affected by any damages actually sustained.
 
 
 14
 CIPS began distributing the ratepayers' portion of the settlement proceeds to its customers in April 1983. In June of the same year, Consol decided to prepay the full $25 million called for in the settlement agreement. Although CIPS had predicated its distribution plan upon the expectation that Consol would be paying the settlement in installments, CIPS did not change the plan once Consol prepaid the settlement. This was necessary, CIPS argued, in order to maintain the relative positions of the ratepayers and the shareholders ordained by the distribution plan.
 
 
 15
 Under the plan, the ratepayers were to receive $18 million while the shareholders were to receive $7 million along with any interest paid by Consol. When Consol prepaid the settlement amount, that interest was lost. In its place, CIPS decided that the shareholders would receive the entire $7 million in one lump sum instead of in installments. Thus, the shareholders would not get the interest, but they would receive, according to Consol, the same benefit--the time value of the amount prepaid by Consol. The ratepayers would still get their $18 million over four years and the shareholders would get their $7 million plus interest, except that the interest would now be in the form of the time value of the lump sum payment prepaid by Consol. With this reasoning, the Company passed the $7 million to its shareholders in the form of a special 10 cent per share common stock dividend in June 1983. The remaining $18 million was distributed to the ratepayers as a credit to fuel expense. These ratepayer distributions were complete by April 1, 1987.
 
 
 16
 Although CIPS obtained Illinois Commerce Commission approval for its proposed distribution of the proceeds to its retail customers, CIPS did not seek to obtain similar approval from FERC.[5] Thus FERC was not aware of CIPS' distribution plan until after 1984 when its staff made a routine audit of CIPS' books and records, covering the period January 1, 1979 through December 31, 1984. See Central Illinois Pub. Serv. Co., 36 FERC p 61,202 (1986).
 
 
 17
 In a Letter Order dated July 31, 1986, the Commission concluded that all the proceeds received from the Consol settlement should have been considered as an adjustment of the fuel costs charged to both retail and wholesale customers through the FAC, unless an alternative disposition of these amounts had been approved by regulatory authorities. Id. at 61,503. The Commission thus determined that, absent FERC approval, it was improper for CIPS to have credited its shareholders with "the wholesale portion of the proceeds which it [i.e. CIPS] unilaterally determined not to pass on to wholesale customers as an adjustment to fuel cost." Id. Instead, the Commission recommended that the CIPS determine the wholesale amounts improperly credited to the shareholders and file with FERC a plan for distribution to the wholesale customers their portion of the withheld $7 million.
 
 
 18
 CIPS disagreed with the Commission's reasoning and requested that the issue of the proper disposition of the settlement proceeds be set for hearing pursuant to 18 CFR § 41.7 (1986). The Illinois Cities, wholesale customers of CIPS, intervened, contending that all settlement proceeds plus interest must be refunded to the ratepayers. On July 22, 1987, presiding Administrative Law Judge ("ALJ") Lewnes issued an Initial Decision, holding that CIPS' disposition of the proceeds was unreasonable and that all proceeds (less CIPS' litigation costs of some $3.8 million) should have been distributed to CIPS' ratepayers. See Central Illinois Public Service Company, 40 FERC p 63,018 (1987) (the "Initial Decision"). Essentially, the Initial Decision held that, because the amount of FAC-related costs claimed as damages exceeded the net settlement proceeds (i.e., the proceeds of the settlement less the company's litigation costs), the ratepayers should receive all of the net settlement proceeds.
 
 
 19
 The FERC Commission staff, the Illinois Cities, and CIPS all filed exceptions to the Initial Decision. CIPS asserted that its distribution of the settlement proceeds was proper and fair because there had been no proportionate determination as to the dollar value of its various damage claims. Thus, there was no way to know, CIPS argued, how much of the settlement proceeds were intended to compensate for the FAC-related cost claims as opposed to the non-FAC-related claims. CIPS also argued that the Illinois Cities were precluded from receiving further settlement proceeds due to a release they entered into in 1984.
 
 
 20
 On August 1, 1988, FERC issued its "Opinion and Order Affirming in Part and Reversing in Part Initial Decision." See Central Illinois Public Service Company, Opinion 309, 44 FERC p 61,191 (1988) ("Opinion 309"). Opinion 309 affirmed ALJ Lewnes' Initial Decision to the extent that it found CIPS' disposition of the proceeds unreasonable. FERC held that the Initial Decision properly concluded that the ratepayers should receive the full amount of the settlement proceeds, including interest, as reimbursement for damages, the cost of which flowed through the FAC and was borne by the ratepayers. FERC also agreed that these settlement proceeds should be passed on as savings to the wholesale ratepayers, including the Illinois Cities, through the FAC billings. Thus, the Commission ruled that the Cities could participate in the refund of settlement proceeds even though the Cities had executed releases in other litigation with CIPS.
 
 
 21
 Nevertheless, in Opinion 309, FERC reversed the Initial Decision's ruling that CIPS could deduct its litigation expenses from the settlement proceeds. The Commission held that CIPS should have either sought recovery of these costs in its base rates or have sought Commission approval for an alternative disposition of the settlement proceeds when they were received from Consol. Thus, the Commission denied CIPS' right to deduct litigation expenses from the proceeds and ordered CIPS to refund fully to its wholesale ratepayers that portion of the settlement improperly allocated to the company's shareholders.
 
 
 22
 Thirty days later, CIPS filed a request for rehearing of Opinion 309. The Commission granted CIPS' petition for rehearing on the limited issue of the releases executed by the Cities as part of a 1984 settlement agreement with CIPS. See Central Illinois Public Service Company, Opinion 309-A, 47 FERC p 61,043 (1989) ("Opinion 309-A"). This 1984 settlement agreement resolved, not only a complex antitrust case, but also three different dockets pending before the Commission. As part of the settlement agreement, each of the municipalities executed a document that provided that CIPS was released:
 
 
 23
 of and from each and every claim, demand, action, cause of action, account, damage, threefold damages, expense, cost, ... or liability of any kind whatsoever whether known or unknown, vested or contingent, in law, equity or otherwise, whether arising in contract, under state or federal law or otherwise, which [Cities] now have, had or may hereafter have against [CIPS] ... expressly including without limitation each and every claim of any kind asserted or which might have been asserted with respect to any rate, term or condition of service of [CIPS] in any proceeding before the [FERC]....
 
 
 24
 Id. at 61,123. CIPS argued that the release bars the Cities from asserting any further claims against it. Because the release was entered into more than a year after the Consol settlement was made public, CIPS maintains that the Cities knowingly released all claims they had to the settlement proceeds from Consol.
 
 
 25
 In Opinion 309-A, the Commission held that the releases did bar any claims the Cities might have had to a share of the settlement proceeds. Id. The Commission found that the releases, by their very language, covered the monies at issue in the settlement with Consol. Id. Opinion 309 was reaffirmed as to all other issues. Thus, the refund ultimately ordered by FERC required payment to wholesale customers other than the Illinois Cities.
 
 
 26
 The Cities filed for rehearing of Opinion 309-A. The Commission denied the Cities' request. Both the Cities and CIPS then petitioned this court for review of the Commission's Opinions, pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. § 825l(b) (1988).
 
 II.
 
 27
 At the outset, we note that on review of a FERC opinion, we grant the Commission considerable deference: "[W]hen we review a Commission order, our responsibility is to determine (1) whether the Commission abused or exceeded its authority; (2) whether each essential element of the Commission's order is supported by substantial evidence; and (3) whether the Commission has given reasoned consideration to each of the pertinent factors in balancing the needs of the industry with the relevant public interests." Peoples Gas, Light and Coke Co. v. FERC, 742 F.2d 1109, 1111 (7th Cir.1984). Thus, an order of the Commission will be reversed only if FERC has not provided "a sound, well-reasoned justification, based upon the evidence in the record, for its action." Northern Indiana Public Service Co. v. FERC, 782 F.2d 730, 739-40 (7th Cir.1986).
 
 
 28
 With this standard of review in mind, we consider three issues on appeal: whether the Commission properly found that CIPS' distribution of the settlement proceeds was unreasonable; whether CIPS was entitled to deduct litigation expenses from the settlement proceeds; and whether the Commission properly found that the plain language of the releases in the 1984 settlement agreement between CIPS and the Cities precluded the Cities from sharing in the settlement proceeds from Consol. We consider each in turn.
 
 
 29
 A. The Distribution of the Settlement Proceeds
 
 
 30
 CIPS argues that its distribution of the proceeds merely reflected the damages claimed and the risks taken, and, therefore, was reasonable and appropriate. CIPS claims that the undisputed evidence in the record demonstrates the reasonableness of its distribution. If anything, argues CIPS, the distribution was generous to the ratepayers. We agree. The evidence presented by both CIPS and by FERC's own trial staff directly supports CIPS' disposition of the settlement proceeds.
 
 
 31
 At the initial hearing, CIPS' Vice President of Corporate Planning, Lowell Dodd, testified that, in the Consol litigation, only a small portion of the claimed damages consisted of increased fuel charges. A substantial portion of the claimed damages, Dodd continued, had been borne by the CIPS' shareholders (particularly the maintenance-related damages) and it was impossible to trace some of the damages to determine whether the ratepayers or shareholders had borne them. See Initial Decision at 65,113. Because the settlement proceeds were not allocated among the particular elements of the claimed damages, CIPS concluded that it would only be fair to distribute the proceeds among all claims--those affecting the ratepayers and those affecting the shareholders.
 
 
 32
 FERC's trial staff essentially agreed with Dodd. FERC's staff witness, Howard Forman, testified that CIPS' distribution of the Consol settlement proceeds was indeed reasonable. Forman testified that the best way to distribute the fungible settlement proceeds was pro-rata, according to the percentage of claimed damages that allegedly were suffered by the shareholders and the percentage allegedly suffered by the ratepayers. Forman determined that, of the claimed damages, 37.18% were FAC-related (i.e. represented costs that likely were passed on to the ratepayers through the FAC) and 62.82% were not.
 
 
 33
 Forman arrived at these figures in the following manner: CIPS claimed a total of $90.4 million in damages from Consol. See Id. at 65,112. Excluding Associated Financing Costs, CIPS showed that $20.429 million of the claimed damages were FAC-related, while $39.747 million were not FAC-related. Id. at 65,115. Forman, however, made two adjustments to these calculations. He took the Limit Switch damages of $1.946 million out of the non-FAC-related column and placed it in the FAC-related column. Then he pro-rated $11.237 million of the Associated Financing Costs to the FAC-related category and $18.986 million of the same costs to the non-FAC-related category. Thus, Forman's total FAC-related damages equaled $33.612 million, representing 37.18% of all claimed damages, and total non-FAC-related damages equaled $56.787 million, representing 62.82% of all damages.
 
 
 34
 Dividing the total interest-adjusted proceeds from the Consol settlement (i.e. $25 million plus $5,955,631 in interest) according to these percentages, Forman thus determined that CIPS' ratepayers were entitled to $11,509,304. Because CIPS had actually distributed $18 million to its ratepayers, Forman concluded that the ratepayers had received more than their pro rata share of the settlement. Id.
 
 
 35
 Thus, the evidence presented by both CIPS and FERC's own trial staff directly supported CIPS' distribution of the settlement proceeds. Only the Cities opposed CIPS' disposition. Robert G. Towers, a public utility rate consultant appearing on behalf of the Cities, presented his thesis that the ratepayers should recover fully any damages they allegedly suffered before any proceeds were applied to satisfy the shareholders' claims or to recover litigation expenses. In other words, Towers argued that CIPS first must make the ratepayers whole before considering other claims to the proceeds.
 
 
 36
 The Cities argued that CIPS' common stockholders are compensated sufficiently for the risks they carry through the rate-making process. The stockholders thereby are provided with an opportunity to earn a fair return out of the rates established by the regulator. The rates the utility may charge are determined on the basis of test year cost-of-service. The "test year" is a financial model, initially constructed by the utility, of its operations. It is a proxy for the conditions that will prevail when given rates are in effect. Rarely will an actual, rate-effective period of the utility's cost-of-service duplicate the corresponding test year value. These variations--which may have a positive or negative effect on earnings--are a manifestation of the risks for which the stockholder has been compensated in the return component of the test year cost-of-service. Thus, the Cities maintain, to allow the stockholder to be reimbursed because an actual expense proved to be greater than the test year expense would be to compensate him twice for the same event. Id. at 65,117.
 
 
 37
 In Opinion 309, the Commission accepted the Cities' arguments. The Commission reasoned that, given the compensation for risk that the shareholders already receive through the rate-making process, the shareholders should not receive any proceeds until the ratepayers are reimbursed fully for all FAC-related costs. Thus, because the amount of FAC-related costs claimed as damages exceeded the settlement proceeds ($33.612 million in claimed total FAC-related damages versus approximately $31 million in total settlement proceeds), the ratepayers must receive all of those proceeds. See Opinion 309 at 61,688.
 
 
 38
 The Commission's reasoning, however, cannot withstand scrutiny. Put simply, there is no "substantial evidence" to support the Commission's decision. See Peoples Gas, 742 F.2d at 1111. In ruling that the entire amount of the settlement proceeds (less the amount subject to the release signed by the Illinois Cities) should have been passed through to the ratepayers, FERC mistakenly assumed that the ratepayers had in fact suffered legally recoverable damages through higher FACs. Yet, no such finding was made. Instead, the seven-year litigation between Consol and CIPS was settled--for whatever reason, Consol agreed to contract termination and payment of $25 million. CIPS, in turn, agreed to accept an amount some $65 million less than what it claimed as damages, in effect dismissing its claims for 28 cents on the dollar.
 
 
 39
 The Commission implicitly determined that the jury would have found Consol liable and would have awarded damages to CIPS. The Commission assumed that the jury would have allocated at least $25 million of the total award (whatever that would have been) to FAC-related damages. These baseless determinations and assumptions do not constitute substantial evidence.
 
 
 40
 The Commission failed to provide "a sound, well reasoned justification, based upon evidence in the record, for its action." Northern Indiana Public Service Co., 782 F.2d at 739-40 (emphasis supplied). There simply is no record evidence, much less "substantial evidence," of the actual amount of damages--if any--suffered by CIPS' customers because of Consol's performance under the coal supply agreement. Neither the untested damage claims of CIPS nor the payments under the settlement agreement constitute substantial evidence that CIPS' customers were in fact damaged with any specific loss.
 
 
 41
 The Commission attempted to justify its decision by creating, and then applying, the following rule: under the "regulatory compact theory" that governs the rate-making process, the settlement proceeds first should be credited to the ratepayers to reimburse them for additional costs that may have flowed through the fuel adjustment. Opinion 309 at 61,688. But with no real evidence to support the amount of damages "suffered" by the ratepayers, this rule provides for a refund of a damage amount solely on the basis of speculation. Neither this court nor the Commission may base its decisions on speculation. See Adams Apple Distributing Co. v. Papelera Reunidas, S.A., 773 F.2d 925, 930 (7th Cir.1985) ("Damages may not be awarded on the basis of conjecture and speculation.").
 
 
 42
 In fashioning its new rule, the Commission pointed for support to City of Vernon, et al. v. Southern California Edison Company, 31 p 61,113 (1985). See Opinion 309 at 61,688 n. 12. That case is inapposite. In City of Vernon, the utility collected refunds from fuel suppliers--which meant that the actual price paid for fuel was lowered--yet did not pass the savings on to customers through the FAC. Because the refunds were directly linked to the price of fuel, FERC held that these refunds should be treated just as "any discounts on the price of fuel at the time of the purchase." 31 FERC at 61,231. In the present case, however, the Consol litigation settled numerous claims of damages, some FAC-related and some non-FAC-related. There was no proof that customers had been overcharged through the FAC, nor was their other proof directly linking all of the collected settlement to the price of fuel. Thus, FERC's heavy reliance on City of Vernon is misplaced.
 
 
 43
 The proper standard to evaluate a utility's disposition of proceeds is whether the disposition "lies within a zone of reasonableness." Plains Electric Generation and Transmission Cooperative, Inc. v. Public Service Co. of New Mexico, 29 FERC p 61,374 at 61,784 (1984). We hold that the record evidence shows that CIPS' disposition was reasonable. The evidence demonstrated that CIPS' shareholders bore a substantial portion of the damages claimed against Consol. The analysis conducted by FERC's own staff witness concluded that only $22.375 million (excluding associated financing costs) of the $90.4 million claimed was related to FAC. Given these relative positions, and the fact that the proceeds from Consol were not allocated to particular claims, CIPS acted fairly and reasonably in distributing those proceeds according to a pro-rata settlement of each damage claim.
 
 B. The Litigation Expenses
 
 44
 Even though it is clear that it was CIPS' prosecution of the Consol litigation that resulted in the $25 million settlement, FERC ruled that CIPS could not recover its litigation expenses before distributing the proceeds. The Commission somehow believed that, by deducting its litigation expenses prior to distributing the proceeds, CIPS was attempting "to recover such costs through the fuel adjustment clause." See Opinion 309 at 61,689. CIPS has done nothing of the sort. CIPS merely sought to recoup the expenses it reasonably incurred in the prosecution of the seven-year litigation.
 
 
 45
 Commission precedent has allowed a utility to deduct its litigation costs from settlement proceeds prior to distributing any of the proceeds to the ratepayers. In Plains Electric Generation and Transmission Cooperative, the Commission, although it disapproved of the submitted disposition plan, found that it was "appropriate" to recover litigation costs from the settlement proceeds of a suit that alleged solely FAC-related damages. 29 FERC at 61,786. In Minnesota Power and Light Co. v. FERC, the Eighth Circuit remanded so that FERC might consider which party should bear the cost of litigation. 852 F.2d 1070 (8th Cir.1988). The court explicitly recognized that, if the utility is unable to recoup its litigation expenses, then an "inequity remains of requiring the shareholders to bear the burden of expenses to obtain a refund benefiting the customers of [the utility]." Id. at 1073. On remand, FERC allowed the utility to be compensated for its legal fees. Minnesota Power and Light Co., 45 FERC p 61,369 (1988).
 
 
 46
 We find it a better exercise of discretion to permit CIPS to recover reasonable litigation expenses prior to distribution of the settlement proceeds. In his Initial Decision, ALJ Lewnes properly recognized that "[e]quity dictates that the charges of litigation leading to the recovery of [the settlement] proceeds should be deducted from those proceeds accruing to the beneficiaries." 40 FERC at 65,120. In response to these arguments, the Commission states only that "equity does not favor those burdened by their own misconduct"--because CIPS failed to obtain prior Commission approval for the distribution, it gambled that its action subsequently may not be ratified. See FERC Brief at 30.
 
 
 47
 Although we agree that CIPS should have obtained prior approval for its distribution, the desire to "punish" the utility for its neglect is not a sound basis for denying CIPS the opportunity to recover its legal expenses. There is no evidence in the record to suggest that CIPS' failure to apprise FERC of its distribution plan was anything more than an inadvertent oversight. CIPS, therefore, should be permitted to recoup from the gross settlement proceeds the legal expenses it reasonably incurred in the prosecution of this lawsuit.
 
 C. The Release of the Cities
 
 48
 The Commission found that the plain language of the 1984 settlement agreement between CIPS and the Illinois Cities precluded the Cities from participating in the distribution of the proceeds from Consol. In this appeal, the Cities argue that, by giving effect to the releases, the Commission permits CIPS to engage in discriminatory treatment. The Cities point out that their 1984 settlement agreement with CIPS included terms that forbid CIPS from charging the Cities more than CIPS' wholesale rural electric cooperative customers or its large industrial customers. After Opinion 309-A, however, CIPS made distributions to cooperatives and its large industrial customers but not to the Cities. Thus, the Cities argue, the Commission's orders do not uphold the language of the 1984 settlement, but instead permit CIPS to violate that agreement.
 
 
 49
 Nevertheless, the Cities cannot avoid the plain meaning of the releases, which dooms their argument. As the Commission appropriately determined, the releases, by their very language, cover the monies at issue here. What other meaning can we possibly attribute to the Cities signed statement to release CIPS "from each and every claim, demand action, cause of action, account, damage, three-fold damages, expense, cost, attorneys fees or liability of any kind whatsoever known or unknown, vested or contingent, in law equity or otherwise, which [the Cities] now have, have ever had or may hereafter have...."?
 
 
 50
 Further, contrary to Cities' argument, giving effect to the releases in no way suggests that CIPS may engage in discriminatory rate-making. Instead, the disparate treatment afforded the Cities is the obvious result of the releases the Cities signed. The Cities gained the benefit of the releases in 1984. They will not be permitted now to deny the plain meaning of that language so that they may also obtain the benefits of the Consol settlement. The Cities must live with the consequences of their voluntary agreement. Thus, the Cities are not entitled to any additional monies above and beyond their share of the $18 million that CIPS voluntarily agreed to disburse to its various ratepayers.
 
 III.
 
 51
 For the foregoing reasons, we REVERSE the order of the Commission (except regarding the release of the Illinois Cities), and REMAND this case so that the Commission accordingly may approve CIPS' distribution of the settlement proceeds from Consol.
 
 
 
 [1]
 The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [2]
 The Illinois Cities are comprised of the Cities of Cairo, Carmi, Casey, Flora, Marshall, Metropolis, Roodhouse and the Villages of Bethany, Greenup, and Rantoul
 
 
 [3]
 British Thermal Unit, or BTU, is a measure of the heating value of coal, expressed in BTUs per pound. The price of coal under the contract was dependent upon the BTU measure of the coal, which indicates its burning characteristics
 
 
 [4]
 The FAC permits the utility automatically to pass on to the ratepayers cost increases or decreases caused by changes in the cost of particular energy sources such as coal. Hence, CIPS was permitted to pass on to its ratepayers increases in coal costs charged by Consol dollar-for-dollar, pursuant to a formula previously approved by FERC
 
 
 [5]
 Thus, the Company's treatment of the settlement proceeds at retail is not at issue. The Commission staff did not challenge the portion of the proceeds not treated as a reduction in the cost of coal for retail FAC purposes because the Company's proposal to retain such amounts was approved by the Chief Accountant of the Illinois Commerce Commission in a letter dated April 21, 1983. See Central Illinois Pub. Serv. Co., 36 FERC p 61,373 at 61,911 n. 1 (1986)
 
 
 *
 See 945 F.2d 1062